**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

JAMES M. BOYD,

                  **Plaintiff,**

-vs-                             **Case No. 6:10-cv-1441-Orl-31KRS**

COMMISSIONER OF SOCIAL SECURITY,

                  **Defendant.**
_____

# REPORT AND RECOMMENDATION

**TO THE UNITED STATES DISTRICT COURT:**

This cause came on for consideration without oral argument on the Complaint filed by James M. Boyd, seeking review of the final decision of the Commissioner of Social Security denying his claim for social security benefits. Doc. No. 1. The Commissioner answered the Complaint and filed a certified copy of the record before the Social Security Administration (SSA). Doc. Nos. 10, 12.

**I.      PROCEDURAL HISTORY.**

In 2004, Boyd applied for benefits under the Supplemental Security Income for the Aged, Blind and Disabled Program (SSI), 42 U.S.C. § 1381, *et seq.* (sometimes referred to

herein as the Act).  R. 20.[1]  He alleged that he became disabled in July 2003.  R. *Id.* Boyd's

application was denied initially and on reconsideration. R. 20.[2]

Boyd requested a hearing before an administrative law judge (ALJ).  R. 16.  An ALJ

held a hearing on October 10, 2007.  Boyd, represented by an attorney, testified at the

hearing.  Helen Freeman, M.D., a medical expert, and Joe Mann, a vocational expert (VE),

also testified.  R. 682-727.

After considering the testimony and the medical evidence presented, the ALJ

determined that Boyd had not engaged in substantial gainful activity since the alleged onset

date of his disability.  R. 21.

The ALJ concluded that the medical evidence showed that Boyd had a history of a

diagnosis of HIV infection, a history of depression, a history of bronchitis/chronic obstructive

pulmonary disease (COPD), and a history of substance abuse (alcohol/cocaine), which were

severe.  R. 22.  These impairments did not meet or equal any of the impairments listed in

the applicable social security regulations.  R. 22, 28, 31.

The ALJ found that Boyd had the residual functional capacity (RFC) to perform full-

time sedentary work, in that he could lift and carry five to ten pounds frequently, stand

_____

[1]  The SSI application is not in the record before the Court.  It appears that Boyd also applied for
disability benefits under the Federal Old Age, Survivors and Disability Insurance Program (OASDI), 42
U.S.C. § 401 *et seq.*  R.  41.  The OASDI application was denied because Boyd did not have enough social
security credits to qualify for OASDI benefits.  *Id.*  Boyd does not challenge that decision in his
memorandum of law.

[2]  The notices of denial of the SSI application are not in the record before the Court.  The record
contains a notice of an award of SSI income payments.  R. 44.  In response to a supplemental briefing
order, counsel advised that Court that this was a preliminary award of SSI payments for up to six months
while the Commissioner made a final determination whether Boyd was disabled and entitled to SSI
payments.  Doc. No. 17.

and/or walk one to two hours and sit six to eight hours per eight-hour workday. He could not climb, and he could perform limited bending, balancing, stooping, kneeling, crouching and crawling, with no prolonged exposure to respiratory irritants, no work in or near dangerous machinery and equipment and no commercial driving. The ALJ found that Boyd had an adequate ability to perform activities within a schedule, maintain regular attendance, and be punctual with customary tolerances on a full-time basis. He also found that Boyd had an adequate ability to understand, remember and carry out simple job instructions, maintain adequate attention and concentration, use judgment, and deal appropriately with changes in a routine work setting in the performance of unskilled work. Finally, he concluded that Boyd would require a low-stress environment performing simple, repetitive tasks with no frequent change in work processes or situation and minimally acceptable contact with coworkers, supervisors, and the general public. R. 25.

In reaching this conclusion, the ALJ found that Boyd's mental impairments would result in slight-to-moderate limitations in activities of daily living and social functioning and moderate limitations in concentration, persistence or pace without consideration of Boyd's history of substance abuse before 2006. If the history of substance abuse was considered, the ALJ found that Boyd would have marked limitations in activities of daily living, social functioning and concentration, persistence or pace with potentially frequent episodes of decompensation. R. 31.

The ALJ did not give controlling weight to the opinion of Dr. Del Rio, who indicated that Boyd could not work a full workday due to limitations in stamina. R. 32. The ALJ also found that Boyd's testimony about the limitations arising from his impairments were not

entirely credible and were not consistent with objective clinical findings and the record as a whole.  R. 35.

Because Boyd had no past relevant work, the ALJ called upon a VE to determine whether there was work available in the national economy that Boyd could perform in light of his RFC.  After considering the VE's testimony and other evidence of record, the ALJ concluded that there were jobs available in the national economy that Boyd could perform. R. 35-37.  Therefore, the ALJ concluded that Boyd was not disabled.  R. 37.

Boyd requested review of the ALJ's decision.  R. 16.  He submitted additional medical evidence to the Appeals Council.  *See* R. 6.  On July 30, 2010, the Appeal Council issued a decision finding no basis to review the ALJ's decision.  R. 7-9.  Boyd timely sought review of this decision by this Court.  Doc. No. 1.

## II.     JURISDICTION.

Plaintiff having exhausted his administrative remedies, the Court has jurisdiction to review the decision of the Commissioner pursuant to 42 U.S.C. § 405(g), as adopted by reference in 42 U.S.C. § 1383(c)(3).

## III.    STANDARD OF REVIEW.

To be entitled to disability benefits under SSI, a claimant must be unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. § 1382c(a)(3)(A).  A "physical or mental impairment" under the terms of the Act is one "that results from anatomical, physiological, or psychological

abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 1382c(a)(3)(D).

Pursuant to 42 U.S.C. § 405(a), the SSA has promulgated a five-step inquiry that must be followed in determining whether a claimant is entitled to benefits. In sum, an ALJ must apply the following criteria, in sequence:

(1) Is the claimant presently unemployed?

(2) Is the claimant's impairment severe?

(3) Does the claimant's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1?

(4) Is the claimant unable to perform his or her former occupation?

(5) Is the claimant unable to perform any other work within the economy?

20 C.F.R. § 416.920(a)(4). An affirmative answer to any of the above questions leads to either the next question, or, on steps three and five, to a finding of disability. A negative answer leads to a finding of "not disabled." *See, e.g.*, *McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986).

"The burden is primarily on the claimant to prove that he is disabled, and therefore entitled to receive Social Security disability benefits." *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001) (citing 20 C.F.R. § 404.1512(a)). However, "the burden temporarily shifts at step five to the Commissioner[,] . . . [who] must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform." *Id.* at 1278 n.2 (citing *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999)).

A court's review of a final decision by the SSA is limited to determining whether the ALJ's factual findings are supported by substantial evidence, *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005) (per curiam), and whether the ALJ applied the correct legal standards, *Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988).

The SSA's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g); *Dyer*, 395 F.3d at 1210. "Substantial evidence is more than a scintilla, and must do more than create a suspicion of the existence of the fact to be established. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Walden v. Schweiker*, 672 F.2d 835, 838-39 (11th Cir. 1982) (internal quotations omitted).

The court "must view the record as a whole, taking into account evidence favorable as well as unfavorable to the [SSA's] decision." *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986) (per curiam) (citing *Tieniber v. Heckler*, 720 F.2d 1251, 1253 (11th Cir. 1983)). Where the SSA's decision is supported by substantial evidence, the court will affirm, even if the court finds that the proof preponderates against the decision. *Dyer*, 395 F.3d at 1210. The court may not reweigh the evidence or substitute its own judgment. *Id.*

While there is a presumption in favor of the SSA's findings of fact, no such presumption attaches to the ALJ's legal conclusion about the proper standards to be applied in evaluating claims. *Welch v. Bowen*, 854 F.2d 436, 438 (11th Cir. 1988) (per curiam). Therefore, the court will reverse if the SSA incorrectly applied the law, or if the decision fails to provide the court with sufficient reasoning to determine that the SSA properly applied the

law.  *Keeton v. Dep't of Health & Human Serv's*, 21 F.3d 1064, 1066 (11th Cir. 1994) (citing *Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991)).

When reviewing a final decision issued by the SSA, the court is authorized to "enter . . . a judgment affirming, modifying, or reversing the decision . . . with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).

## IV.    STATEMENT OF FACTS.

After a thorough review of the record, I find that the pertinent facts are adequately presented in the decision of the ALJ and the parties' memoranda.  Therefore, I will only summarize the evidence to protect Boyd's privacy to the extent possible.

*A.    Personal Information.*

Boyd was born in 1963.  R. 700.  He completed school through the twelfth grade.  R. 701.  Boyd's representative informed the SSA on May 14, 2004, that Boyd was homeless and lived in and out of shelters.  R. 143; *accord* R. 174, 177.  At the ALJ's hearing, Boyd testified that he was still living in a place "more like a shelter . . . ."  R. 687.

*B.    Medical Records and Medical Expert Testimony.*

In December 2000, Boyd sought emergency department treatment for a cough and difficulty breathing.  He denied fever, chills, sweats, nausea, vomiting and diarrhea.  He admitted that he used alcohol (ETOH).  He had also had an unintended weight loss of more than ten pounds.  He indicated that he was homeless.  R. 339. He was treated with an antibiotic and released.  R. 337-39.

Boyd was hospitalized in July 2003 for acute bronchitis. At that time, he was found to have a human immunodeficiency virus (HIV) with a CD4 count of 329. R. 134.[3]

Boyd went to an emergency room in February 2004 complaining of a cough and chills. R. 229. He admitted using tobacco and alcohol. R. 229. A CT scan revealed splenomegaly. R. 231. A chest x-ray showed COPD. R. 237. He was treated with antibiotics and discharged. R. 230.

In March and April 2004, Boyd sought emergency room treatment for abdominal pain initially with nausea, vomiting, and diarrhea. R. 215, 223, 462. He was discharged with a prescription for Motrin. R. 222.

Boyd was hospitalized against in May 2004. The diagnoses were pneumonia, COPD, and HIV. R. 160, 174 (tuberculosis was ruled out). Boyd initially complained of fatigue, weight loss, fever, excessive sweating (diaphoresis), dyspnea, cough, wheeze, and shortness of breath. R. 147, 153. His CD4 count had fallen to 118, and AIDS was diagnosed. R. 176. There is also a notation indicating cocaine abuse. R. 176.

Boyd sought emergency room treatment in December 2004 based on complaints of chest pain, a sore throat and feeling weak with dyspnea and a mild headache. R. 209. A chest x-ray revealed some degree of COPD. R. 236. The diagnosis was bronchitis. R. 210.

In February 2005, Boyd had sores in his mouth that did not seem to be thrush. He was treated with medication. R. 273.

---

[3] "CD4 cells are destroyed by HIV. A healthy person's count is 500 or greater, and HIV progresses to AIDS when a person's CD4 count drops below 200." Doc. No. 15 at n.1.

In April 2005, Boyd had an appointment for treatment of AIDS.  R. 238.  He stated that he had no complaints.  R. 246.  He declined an examination that day because he was starting a new job that afternoon.  R. 238.  He denied use of alcohol.  R. 239.

In May 2005, Boyd sought emergency room treatment for a cough with fevers, chills and night sweats and some abdominal pain.  R. 356.  He admitted smoking and use of alcohol and marijuana.  R. 357.  X-rays showed emphysemative changes in both lungs.  R. 358.

In October 2005, Boyd went to an emergency room complaining of shortness of breath with fever, a cough and a toothache.  He had no nausea, vomiting or diarrhea, and no chest pain.  R. 269.  He was not in respiratory distress.  R. 271.  An x-ray taken on October 25, 2005 revealed moderate emphysema.  R. 526.

Eric Boyette, ARNP, examined Boyd in January 2006.  Boyd's only complaints appear to have been red and swollen gums and a neck problem.  Boyd reported that he last used crack 60 days earlier and that he was in treatment.  ARNP Boyette prescribed ibuprofen and reviewed with Boyd the technique for using an inhaler.  R. 256.

Chrystal Wilson, MA, LAPC, a psychotherapist, first examined Boyd on January 31, 2006.  Boyd reported that he had a prior criminal history and spent time in prison from 1994 through 1996.  He indicated that "he began drinking as a child.  He reported that he started smoking marijuana at age 17.  At age 23, he began snorting cocaine.  He reported that his progression was snorting cocaine, to smoking cocaine in cigarettes, to cooking it and smoking crack.  [He] considers himself as a drug addict and alcoholic."  R. 250.  Wilson noted that Boyd was attentive with no memory impairment, his insight was average and his

judgment was within normal limits. She opined that he had alcohol and cocaine dependence in early full remission in a controlled environment, with a global assessment of functioning (GAF) of 62. R. 250.

On February 2, 2006, ARNP Boyette completed a Medical Report on Adult with Allegation of HIV Infection. R. 303-05. He indicated that Boyd's CD4 count in January had been 326. He opined that Boyd had emphysema/COPD with mild symptoms. He checked a box indicating that Boyd had marked difficulties in completing tasks in a timely manner due to deficiencies in concentration, persistence or pace, but he provided no support for that conclusion. R. 305. This form bears the signature of Carlos Del Rio, M.D., but there is no record evidence that Dr. Del Rio examined Boyd.[4] *Id.*

On February 6, 2006, ARNP Boyette examined Boyd for the second time. Boyd complained of problems with his feet, ears and throat, but he was not in pain. ARNP Boyette diagnosed thrush. R. 255.

On March 16, 2006, ARNP Boyette prepared a physical RFC form, which was also signed by Dr. Del Rio. ARNP Boyette indicated that Boyd could sit for three hours and stand or walk for three hours during an eight-hour workday. R. 307. He could work a total of six hours in an eight-hour workday. He could lift up to ten pounds occasionally and five pounds frequently. R. 308. He could occasionally bend and squat but never climb or crawl. R. 309. ARNP Boyette indicated that Boyd "may have decreased stamina" due to AIDS. R. 310.

---

[4] Boyd testified at the ALJ's hearing that he had never met Dr. Del Rio. R. 711. ARNP Boyette wrote that he had examined Boyd three times before he completed this form, in April 2005, January 2006 and February 2006. R. 310. ARNP Boyette is affiliated with Grady Health. The only Grady Health record of examination of Boyd in April 2005 is not signed by Boyette. R. 238.

ARNP Boyette also wrote that Boyd would be disabled due to AIDS even when he was substance free.  R. 316.

ARNP Boyette examined Boyd the day after he prepared the physical RFC form.  At that time, Boyd had no pain, no lesions, and his CD4 level was 326.  R. 254.

On March 8, 2006, Brian Teliho examined Boyd based on a referral from OCW[5] due to his unstable mood, anger and despair.  R. 248.  He prescribed Lexapro to help with Boyd's mood.  R. 248.

On March 21, 2006, Gwen Davies, Ph.D., with Positive Impact, prepared a Medical Evaluation (Affective Disorders) form.  Dr. Davies indicated that Boyd had been examined twice a week from January 26, 2006 through April 20, 2006.  R. 312.  Records before the Court reflect that therapist Wilson met with Boyd during this period, not Dr. Davies.  *See* R. 529-46, 548-55, 557-65, 567-83.[6]  Dr. Davies reported that Boyd had sleep disturbance, feelings of guilt and worthlessness, difficulty concentrating or thinking, hyperactivity, inflated self-esteem, easy distractibility, and a current history of being unable to function outside a highly supportive living arrangements for one or more years.  R. 312-14.  She opined that Boyd had marked restrictions in activities of daily living and social functioning, and slight deficiencies of concentration, persistence and pace.  R. 314.

As of May 31, 2006, Teliho noted that Boyd was abstinent and stable on medication.  R. 566.

_____

[5]  OCW appears to be a residential drug treatment facility for persons with HIV/AIDS in Georgia.  *See* R. 548, 556, 710.  When Boyd left OCW housing, he entered a program at the Hope House.  *Id.*

[6]  At the ALJ's hearing, Boyd testified that Dr. Davies was the head psychologist at Positive Impact.  R. 704.

Wilson continued to be Boyd's psychotherapist through September 2006. *See* R. 529-46, 548-55, 557-65, 567-83. In July 2006, she opined that Boyd met Listing 12.04 separate and apart from any history of drugs or alcohol usage. R. 317. Her notes reflect that Boyd requested a letter stating that he was mentally incapable of working. R. 557-65.

Matthew Hoffman, M.D., examined Boyd in April 2007 after he was hospitalized for COPD exacerbation. R. 351. Boyd was discharged after his condition improved with medication. R. 352.

Boyd was hospitalized again in May 2007 due to a cold, fever and chills. R. 380. He admitted that he smoked and drank alcohol. R. 383. An x-ray showed "extensive bullous emphysematous change" in the left lung. R. 403. As of May 11, 2007, Boyd did not have any complaints. R. 384. The medical records reflect that his CD4 was 306 the previous month. He refused antiretroviral therapy. R. 384. The discharge diagnosis was COPD exacerbation, HIV, and chronic lung disease. R. 388. The record reflects that Boyd was homeless. R. 389.

On September 9, 2007, R. Bruce Prince, M.D., examined Boyd. Boyd reported being depressed with an inability to concentrate, difficulty completing tasks, sadness, low self-esteem, decreased energy, night sweats, increased irritability and an increased desire to sleep and be withdrawn. He had been incarcerated due to disorderly conduct and domestic issues. He had thoughts of suicide but no attempts. He reported out-of-control rage in the past. He also acknowledged using cocaine and other drugs and alcohol on and off for ten years. He had not used alcohol the previous eighteen months, and he was attending AA meetings. R. 417-18. He was also in substance abuse treatment. R. 419. Boyd indicated

-12-

that he lived alone.  During the day he read, watched movies and associated with friends.

He was able to do household chores, including grocery shopping, cooking and cleaning.  R.

418.

Upon examination, Dr. Prince found that Boyd was oriented and able to complete

psychological memory tests.  His insight was significant and his judgment appropriate.  R.

418.  Dr. Prince's impression was alcohol and cocaine abuse reported to be in remission for

eighteen months and major depression in partial remission with a GAF score of 58.  R. 419.

Dr. Prince opined that Boyd had a good ability to follow work rules, deal with the public and

use judgment, and a fair ability to relate to co-workers, interact with supervisors, deal with

work stresses, function independently and maintain attention/concentration.  R. 420.  He

could not follow complex job instructions and would have a poor ability to follow detailed job

instructions, but he would have a fair ability to follow simple instructions.  He would also

have a fair ability to behave in an emotionally stable manner, relate predictably in social

situations and demonstrate reliability.  R. 421.

In November 2007, Boyd reported that he drank alcohol but that he had not used

cocaine for six months.  R. 625.  He complained of chest pain, shortness of breath, but no

abdominal pain, vomiting or dysuria.  R. 625.  An x-ray showed severe emphysema.  R. 623.

 The diagnosis for the chest pain was gastroesphogeal reflux disease (GERD).  R. 626.  He

was treated again in December 2007 for COPD with bronchitis.  R. 646.  At that time, he

reported no alcohol or drug use.  R. 645.

At the ALJ's hearing, Dr. Freeman testified after review of Boyd's records.  She

initially noted a diagnosis of alcoholism continuing through 2007, which was a significant

factor in Boyd's ability to work.  R. 689.  However, on cross-examination she found only references to alcohol use, but no diagnosis of alcoholism.  R. 693-95.  She found no laboratory reports supporting the diagnosis of HIV or AIDS, and no treatment for those diseases.  R. 689; *accord* R. 703 (Boyd acknowledged that he had not received medication for HIV/AIDS).  Dr. Freeman noted that Boyd had significant lung impairments which would limit him to work in a clean respiratory environment with no unusual smells or temperatures.  R. 691.  She opined that Boyd should only perform sedentary work.  He could stand or walk about one to two hours a day, but not consecutively.  He had no limitation on sitting.  R. 692.  He could not engage in postural activities all day long.  R. 693.

> C.    *Claimant's Testimony Regarding Functional Limitations.*

At the ALJ's hearing, Boyd complained of night sweats about ten days a month and difficulty sleeping that made it hard to get out of bed the next day.  He also did not feel well due to breathing problems and shortness of breath.  R. 706, 713, 719.  He also complained of headaches, which he treated with Tylenol, dizziness and facial lesions.  R. 713-14.  He estimated that he had diarrhea twice a week.  R. 715.

Boyd testified that he could not sit for extended periods because he would "get agitated."  R. 703.  He estimated that he could lift up to fifteen pounds occasionally.  R. 716.  He complained of no motivation and lack of energy due to depression.  He had failed at job attempts because he did not come to work dependably.  R. 705-06, 708.  He could not deal with pressure.  R. 707.  He had difficulty concentrating on tasks due to preoccupation with other thoughts.  R. 709.

Boyd acknowledged that drinking alcohol had caused him a lot of problems. He indicated that he had been sober for two years. R. 710.

### D. *Vocational Expert Testimony*.

After review of the records before the ALJ, the VE testified that Boyd did not have any past relevant work. R. 688.

The ALJ asked the VE to assume the following hypothetical individual under age 50, with a high school education and no past relevant work experience:

> The individual could lift up to just under 10 pounds occasionally, could stand and walk for one to two hours and/or sit for six to eight hours during an eight-hour period. There would be an adequate ability to use the upper extremities for pushing and pulling, as well as reaching, handling, fingering, and feeling. There could be no climbing, limited ability to maneuver the spine for bending, balancing, stooping, kneeling, crouching, and crawling; adequate visual acuity both far and near; adequate depth perception; adequate ability to hear and speak. There could be no prolonged exposure to respiratory irritants, no work with or in proximity to dangerous machinery and equipment, no commercial driving. Although somewhat limited by physical symptoms, there would, nevertheless, be an adequate ability to perform activities within a schedule, maintain regular attendance, and be punctual with customary tolerances. The individual would need a low-stress work environment, performing simple, repetitive tasking with minimal contact with supervisors, coworkers, and the general public. There would be an adequate ability to use judgment, and an adequate ability to deal with ordinary changes in a routine work setting.

R. 722-23. The VE testified that this hypothetical individual could perform unskilled sedentary work including sorter (DOT 521.687.086), assembler (DOT 732.684.062), or polisher (DOT 713.684.030). R. 723-24; *see also* R. 124-32 (DOT job descriptions).

The ALJ then asked the VE to assume that this hypothetical individual would have the following additional limitations:

> [T]he individual would experience extreme fatigue that would result in the ability to stand, walk, and sit less than eight hours during an eight-hour period. There would also be a significant limitation in the ability to perform activities within a schedule, maintain regular attendance, and be punctual with customary tolerances.

R. 724. The VE testified that with these additional limitations, the hypothetical individual could not perform any full-time competitive work. R. 724-25. Similarly, if the hypothetical individual had the limitations reflected in ARNP Boyette's physical RFC assessment, there would be no jobs he could perform. R. 725. Finally, if the hypothetical individual had marked limitations in completing tasks in a timely manner due to deficiencies in concentration, persistence or pace, he could not perform available jobs. R. 725-26.

## V.     ANALYSIS.

Boyd argues that the ALJ did not apply the correct legal standards to the opinions of treating professionals and incorrectly relied on the testimony of the nonexamining medical expert. He contends that the ALJ erred in finding that his testimony was not entirely credible. He asserts that the ALJ erred by failing to include moderate limitations in concentration, persistence or pace in the hypothetical question to the VE. He further submits that the ALJ's finding regarding the impact of substance abuse is not supported by the record. Finally, he asserts that neither the ALJ nor the Appeals Council adequately investigated the facts and developed arguments both for and against granting benefits. He

asks that the Court reverse the Commissioner's decision and award benefits. These are the only issues I will address.[7]

A.    *Treating Professionals.*

Boyd argues that the ALJ erred by failing to give significant weight to the opinions of ARNP Boyette, Dr. Del Rio and Dr. Davies, all of whom he suggests were treating physicians. In this circuit, the opinion of a treating physician "must be given substantial or considerable weight unless 'good cause' is shown to the contrary." *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997) (citing 20 C.F.R. § 404.1527(d)(2)). Good cause has been found "where the doctor[s'] opinion[s] [were] not bolstered by the evidence, . . . where the evidence supported a contrary finding[,] . . . [or] where the doctors' opinions were conclusory or inconsistent with their own medical records." *Id.* (internal citations omitted). While an ALJ may disregard a treating physician's opinion that a claimant is disabled or unable to work, *see* 20 C.F.R. §§ 404.1527(e)(1), 416.927(e)(1), the ALJ must articulate reasons for giving less weight to the functional capacity assessments of a treating physician. *Lewis*, 125 F.3d at 1440.

The record does not support Boyd's argument that Drs. Del Rio and Davies were his treating physicians. Boyd testified that he had never met Dr. Del Rio. There are no treatment records from Dr. Del Rio in the record. The record is equally lacking in records showing that Dr. Davies treated Boyd. As discussed above, the only records of treatment

---

[7] The parties were advised that issues not specifically raised would be waived. Doc. No. 11 at 2.

during the time reflected in Dr. Davies' assessment show that therapist Wilson, not Dr. Davies, was the treating professional.

The ALJ did not give controlling weight to the physical RFC assessment signed by ARNP Boyette and Dr. Del Rio because it was conclusory and not supported by objective medical facts and clinical findings in the record. R. 32. The ALJ noted specifically that the records from Grady Health, where both of these professionals worked, do not show lack of stamina that would limit Boyd to working no more than six hours during an eight-hour workday. He observed that other treatment records did not indicate persistent weakness or fatigue. R. 32.

Substantial evidence supports the ALJ's findings. As reviewed above, ARNP Boyette had examined Boyd only two or three times before the physical RFC assessment was prepared. In those visits, he confirmed that Boyd suffered from HIV. There is, however, no indication in ARNP Boyette's records that he observed or that Boyd complained of fatigue or weakness. Other treatment records reflect that Boyd only complained of fatigue and weakness on the occasions when he sought treatment for exacerbation of COPD/emphysema. Therefore, the ALJ articulated good cause supported by evidence in the record for not giving substantial weight to the opinions of ARNP Boyette and Dr. Del Rio.

As for the mental RFC assessment prepared by Dr. Davies, the ALJ observed that the treatment relationship was only three months and that the form was not supported by citation to the treatment notes on which the assessment was based. He noted that neither the Positive Impact records nor other records substantiate marked deficits in daily and social functioning. Rather, therapist Wilson's notes reflect that Boyd was alert, fully oriented with

-18-

no acute or persistent problems with memory, concentration of cognition. Both the GAF

score of 62 assigned by Dr. Davies and the GAF score of 58 assigned by Dr. Prince reflect

light to moderate restrictions. Therefore, the ALJ concluded that the limitations in Dr.

Davies' form were inconsistent with and contradicted by the record as a whole. R. 33.[8]

The reasons articulated by the ALJ are supported by substantial evidence in the

record. At the initial meeting with Boyd, therapist Wilson found that Boyd was attentive with

no memory impairment, his insight was average and his judgment was within normal limits.

Her subsequent treatment notes reflect that Boyd was attentive and aware of his

circumstances, oriented, with adequate judgment. *See* R. 543, 551, 554. On examination in

2007, Dr. Prince confirmed through testing that Boyd was oriented and able to complete

memory tests with significant insight and appropriate judgment. R. 419. While the records

reflect Boyd's concerns about anger management, therapist Wilson wrote in August 2006

that anger management worksheets were helping Boyd understand more about his use of

anger. R. 577. He reestablished contact with his children and his daughter's mother. R.

546, 559, 578. Therefore, the ALJ articulated good cause supported by evidence in the

record for not giving substantial weight to the opinion of Dr. Davies.

---

[8] Boyd complains that the ALJ incorrectly stated that there was no reference in the records to the claimant's need for a supportive living arrangement. *See* R. 33. Although there is ample evidence that Boyd sought supportive living arrangements while obtaining drug treatment at OCW and the Hope House, there is no record from a treating professional indicating that Boyd needed such a supportive living arrangement. Indeed, therapist Wilson's records reflect that Boyd made the decision to leave OCW and move to the Hope House, R. 548, and therapist Wilson believed that Boyd must "begin to incorporate aspects of the outside world" in his life, R. 554.

B.    *Credibility.*

Boyd contends that the ALJ erred by failing to credit his testimony about limitations arising from shortness of breath, headaches, night sweats, diarrhea, and facial lesions.  *See* Doc. No. 13 at 13.[9]  The ALJ must consider all of a claimant's statements about his symptoms, including pain, and determine the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence.  20 C.F.R. § 416.929.  In determining whether the medical signs and laboratory findings show medical impairments which reasonably could be expected to produce the pain and other subjective symptoms alleged, the ALJ must apply the Eleventh Circuit's three-part "pain standard":

> The pain standard requires (1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain.

*Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995).  "A clearly articulated credibility finding with substantial supporting evidence in the record will not be disturbed by a reviewing court."  *Id.* at 1562.

The ALJ credited Boyd's testimony about nonexertional limitations, finding that he would be "somewhat limited by subjective symptoms including pain."  R. 25.  With respect to shortness of breath, the ALJ credited Boyd's testimony that he experienced shortness of breath, and he addressed that problem by limiting Boyd's RFC to sedentary work.  R. 28.

_____

[9]  In this portion of his memorandum, Boyd presents an extensive list of nonexertional complaints in the record.  However, the only issue he raised with specificity, as required by the scheduling order, is that the ALJ improperly found his testimony that he had "shortness of breath from daily activities (Tr. 713), headaches that last all day (Tr. 713), night sweats (Tr. 719), diarrhea (Tr. 715) and cold sores in the cheeks and herpes in the nose where liquid, puss, and blood comes out (Tr. 714)."  Doc. No. 13 at 13.

The ALJ also reviewed the record of medical treatment for respiratory problems. R. 27. He correctly noted that episodes of exacerbation of his pulmonary disease resolved with medication, and there was no evidence of persistent loss of breathing capacity. He also correctly observed that no treating or examining physician found that Boyd's respiratory impairments were disabling. *Id.*

As for the other nonexertional impairments about which Boyd testified, the ALJ expressly noted Boyd's testimony. R. 22. He thoroughly reviewed the medical record, addressing specifically headaches, abdominal pain, diarrhea, and facial lesions. R. 23-24, 27. The ALJ observed that "[n]o treating or examining physician documented the nature, severity, and limiting effects of the claimant's impairments, with sufficient medical facts and clinical findings, which would corroborate the claimant's assertions of disabling pain and other symptoms, together with functional limitations, which would preclude the performance of all full-time work." R. 26. He found that while "[o]verall, the claimant may experience periods of bothersome symptoms and some requirements of activity modification, . . . there was no substantiation in the medical evidence of record as a whole of debilitating pain distress or other symptoms to the point of disability as a result of any musculoskeletal or other condition." R. 29. These findings are supported by substantial evidence.

In his memorandum of law, Boyd cites only one instance in which he complained of a headache. Doc. No. 13 at 7 (citing R. 209). He noted only one occasion when he was treated for facial lesions. *Id.* at 13 (citing R. 273). His complaints of night sweats were associated with instances in which he had exacerbation of his respiratory problems in May 2004, R. 147, 174, and May 2007, R. 357. Similarly, medical records reflect that Boyd

complained of diarrhea only when he sought treatment for abdominal pain. *See* R. 23; *see also* R. 271 (no diarrhea), 337 (no diarrhea).

The ALJ followed the law in assessing Boyd's complaints of nonexertional complaints and clearly articulated adequate reasons supported by the record to find that those nonexertional complaints were not as limiting as Boyd contends. Therefore, this assignment of error is unavailing.

C. *Moderate Limitations in Concentration, Persistence or Pace.*

In his third argument, Boyd contends that the ALJ erred by not including moderate limitations in concentration, persistence or pace in the RFC finding and in the hypothetical question to the VE. He also asserts that the ALJ made contradictory findings that he would have moderate limitations in concentration, persistence or pace and that he could maintain adequate attention and concentration.

The ALJ's decision does not contain conflicting findings. The ALJ explicitly found that Boyd would have moderate limitations in concentration, persistence of pace. R. 31. Despite these limitations, the ALJ found that Boyd had "an adequate ability to understand, remember and carry out simple job instructions, maintain adequate attention and concentration, use judgment, and deal appropriately with changes in a routine work setting *in the performance of unskilled work.*" R. 25 (emphasis added). The ALJ, therefore, concluded that "[o]verall, the medical and other evidence of record as a whole does not substantiate persistent mental health deficits that would severely affect (diminish) the claimant's ability to follow work rules, observe a regular work schedule, *maintain attention and concentration in the performance [of] routine tasks*, understand and carry out job instructions, deal with ordinary work stress,

interact appropriately with supervisors and coworkers, observe an acceptable work pace, complete tasks in conformance with requisite quality and accuracy standards, and perform other essential work-related activities."  R. 31 (emphasis added).

Substantial evidence in the record supports this conclusion.  The ALJ cited Dr. Prince's finding that Boyd "would have a satisfactory ability to perform essential work-related or daily activities other than the ability to understand, remember, and carry out detailed and complex job instructions." R. 30.  He noted that Dr. Davies found that Boyd had only slight limitations in concentration, persistence or pace.  R. 33.

In *Winschel v. Commissioner*, 631 F.3d 1176, 1181 (11th Cir. 2011), the United States Court of Appeals for the Eleventh Circuit stated that limitations in concentration, persistence or pace must be included explicitly or implicitly in hypothetical questions presented to a VE.  In this case, the ALJ explicitly included his findings about the limitations arising from moderate limitations in concentration, persistence or pace in the hypothetical question to the VE by limiting the work the hypothetical individual could perform to "simple, repetitive tasks." R. 723.

Based on review of the record as a whole, the ALJ did not make conflicting findings regarding Boyd's limitations in concentration, persistence or pace.  He made explicit findings regarding the work-related functions that Boyd could perform despite these limitations and included those work-related functional limitations in the RFC and in the hypothetical question to the VE.  Therefore, this assignment of error is also not well taken.

*D.      Substance Abuse.*

In 1997, Congress amended the Act "to provide that a claimant 'shall not be considered to be disabled . . . if alcoholism or drug addiction would . . . be a contributing factor material to the Commissioner's determination that the individual is disabled.'" *Doughty v. Apfel*, 245 F.3d 1274, 1278-79 (11th Cir. 2001) (citing 42 U.S.C. § 423(d)(2)(C)). "The key factor in determining whether drug addiction or alcoholism is a contributing factor material to the determination of a disability . . . is whether the claimant would still be found disabled if he stopped using drugs or alcohol." *Id.*

In the present case, Boyd asserts that the ALJ erred by disregarding ARNP Boyette and therapist Wilson's opinions that he would be disabled even when substance abuse free and by relying on the testimony of the medical expert that alcoholism was a contributing factor to his disability. In making this argument, Boyd ignores significant evidence of record.

As noted by the ALJ, Boyd told therapist Wilson that he considered himself to be a "drug addict and alcoholic." R. 250. He admitted that he began drinking alcohol as a child, using marijuana at age 17, and using cocaine and crack beginning at age 23. *Id.; see also* R. 357, 417. Dr. Teliho concluded on March 8, 2006, that Boyd was alcohol and cocaine dependent, albeit in early full remission based on Boyd's reports. *Id.* Dr. Prince also found that Boyd had alcohol and cocaine abuse purportedly in remission. R. 419.

The record is, however, inconsistent regarding Boyd's reports of sobriety. A treatment record dated May 2007 reflects that Boyd admitted drinking alcohol. R. 383. Yet, in September 2007, he told Dr. Prince that he had been substance abuse free for the previous eighteen months. R. 417. Then, in November 2007, Boyd reported that he drank

alcohol but that he had not used cocaine for six months.  R. 625.  Finally, Boyd's attorney

acknowledged at the first hearing before the ALJ that "[t]he issue of drug and alcohol abuse .

. . is problematic . . . .  The Commissioner is really very specific about looking for a period of

time when we have actual documented records of what the individual is like when they are

free.  We have statements that in early '06 . . . he's been free of substance, but we don't

have detailed psychological/psychiatric evaluation.  So as of now, I would have to say that

his psychological or psychiatric issues are DANA [drug addiction and alcoholism]  . . .

related."  R. 674.

　　This evidence supports Dr. Freeman's testimony that Boyd was an alcoholic even

though there is no diagnosis of alcoholism in the record.

　　As Boyd argues, both ARNP Boyette and therapist Wilson rendered opinions that

Boyd would be disabled if substance abuse free.  Their medical records provide no basis for

these opinions, however.  When ARNP Boyette rendered his opinion, he had only examined

Boyd two or three times, and there is no indication that drug or alcohol abuse was discussed

in the treatment records.  Therapist Wilson rendered her opinion after Boyd asked her for a

letter supporting his application for disability.  Boyd does not contend that her opinion that

his condition met or equaled a listed impairment is supported by the evidence, and Dr.

Davies, her supervising psychologist, did not support her assessment.

　　Accordingly, the ALJ's finding regarding the impact of substance abuse is supported

by substantial evidence and consistent with the law.

*E.      Development of the Record.*

Boyd argues that neither the ALJ nor the Appeals Council performed their inquisitorial duty to investigate the facts and develop arguments for and against disability.  This section of his memorandum merely restates the earlier arguments addressed above.

## VI.      RECOMMENDATION.

For the reasons set forth herein, I **RESPECTFULLY RECOMMEND**, that the Court **AFFIRM** the decision of the Commissioner.  I further recommend that the Court direct the Clerk of Court to issue a judgment consistent with its ruling and, thereafter, to close the file.

Failure to file written objections to the proposed findings and recommendations contained in this report within fourteen (14) days from the date of its filing shall bar an aggrieved party from attacking the factual findings on appeal.

Respectfully recommended this 17th day of November, 2011.

*Karla R. Spaulding*
KARLA R. SPAULDING
UNITED STATES MAGISTRATE JUDGE